# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 19 CR 625 |
| Plaintiff, ) | |
| ) | District Judge John Z. Lee |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| FRANCISCO ROCHA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

The government has moved to detain Defendant Francisco Rocha ("Defendant") pending his trial on a three-count indictment charging conspiracy to engage in unlawful firearms trafficking and to unlawfully bring firearms from Wisconsin to Illinois, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A) and 922(a)(3) (Count I), along with substantive violations of Sections 922(a)(1)(A) (Count II) and 922(a)(3) (Count III). A detention hearing was held before the Court on September 10, 2019. As stated on the record, the Court is ordering the detention of Defendant based on the Court's findings that (1) by a preponderance of the evidence, there are no release conditions or combination of conditions that will reasonably assure Defendant's appearance in this matter as required,[1] and (2) by clear and convincing evidence, there are no such conditions that will reasonably assure the safety of the community. See 18 U.S.C. § 3142(e). This Memorandum Opinion addresses the second of those findings in greater detail, and specifically why the Court is finding that no release condition will reasonably assure the safety of the community under the circumstances of this case, applying the statutory factors found in Section 3142(g).

---

[1] The Court's required written findings as to risk of non-appearance are contained in a separate order of detention.

I.  **Background**

A.  **Alleged Facts**

The indictment alleges that Defendant enlisted his co-defendant, Kirk Valentine, into a scheme to purchase 19 handguns in the State of Wisconsin, using Valentine as a "straw purchaser" who is alleged to have falsely certified that he was the actual buyer of the firearms, so that Defendant could transfer the firearms to other, unnamed persons in the Northern District of Illinois. Indictment at 3-4. The indictment describes 19 separate firearms that Defendant allegedly caused to be purchased in March, April and May of 2018, by Valentine at Defendant's direction, at retailers in various Wisconsin towns including Onalaska, La Crosse, Holmen, and Sparta, and at gun shows in Onalaska and Union Grove. Valentine is alleged to have falsified, at Defendant's direction, U.S. Bureau of Alcohol, Tobacco and Firearms point-of-purchase documents affirming that he was the actual buyer. The indictment describes the firearms as follows:[2]

| # | FIREARM TYPE | SERIAL NUMBER |
|---|---|---|
| 1 | LCP Ruger .380 pistol | 372096520 |
| 2 | LCP Ruger .380 pistol | 371956237 |
| 3 | LCP Ruger .380 pistol | 372096541 |
| 4 | Century Arms Draco 7.62 by 39 caliber pistol | RASA47P002299 |
| 5 | Glock G20 Gen 4 10mm pistol | BGRY050 |
| 6 | Taurus PT809 9mm pistol | TG059031 |
| 7 | Taurus G2C 9mm pistol | TLM96308 |

---

[2] The product descriptions in the chart are based on corrections (from the indictment) supplied by the government at the detention hearing.

2

| 8  | Taurus PT709 9mm pistol                  | TJY50709 |
|----|------------------------------------------|----------|
| 9  | Glock 42 .380 caliber pistol             | ACWV128  |
| 10 | Smith & Wesson BG380CT .380 caliber pistol | KEP2273 |
| 11 | Master Piece Arms MPA930SST 9mm pistol   | FX04856  |
| 12 | Master Piece Arms MPA930SST 9mm pistol   | FX04866  |
| 13 | Smith & Wesson BG380 .380 caliber pistol | KFB0458  |
| 14 | Glock G29G4 10mm pistol                  | BDWR359  |
| 15 | Glock G20G4 10mm pistol                  | BHEH168  |
| 16 | EAA Windicator .357 caliber revolver     | 173625   |
| 17 | Springfield XDE 9mm pistol               | HE911618 |
| 18 | Glock G23 FDE .40 caliber pistol         | BBAV537  |
| 19 | Taurus G2C 9mm pistol                    | TLN54605 |

At the detention hearing, the government introduced six Chicago police arrest reports reflecting law enforcement's recovery of seven of the above firearms (matched by serial numbers in the police report to the serial numbers in the indictment) from six persons in incidents in which the Chicago police arrested those six persons on criminal charges. *See* Govt. Exs. 1-6. Based on allegations in the indictment and in the six arrest reports, further relevant details about the recovery of these seven handguns from the indictment are set forth below:

| # (from above table) | Initial sale date in Wisconsin | Recovery date in Chicago | Relevant information |
|----------------------|-------------------------------|--------------------------|----------------------|
| 3                    | 3/8/18                        | 5/7/18                   | Police found the LCP Ruger .380 pistol, along with three live rounds, hidden in the waistband of a man they arrested at 6:45 p.m. at 1719 N. Keeler Ave. for unlawful use of a firearm. The report stated that the man admitted to membership in a street gang. |

3

| 9 | 5/17/18 | 5/27/18 | Police found the Glock 42 .380 pistol, loaded with a full 10-round magazine, on the floor of a car near where a man stood at 11:25 p.m. at 251 E. Pearson St., near Lake Shore Park. The man, who was arrested for unlawful use of a firearm, told police he was active in a street gang and received the weapon from fellow gang members whom he refused to identify. |
|---|---|---|---|
| 11 | 5/19/18 | 5/31/18 | Police found the two Master Piece Arms MPA 930SST 9mm pistols in their cases in a plastic bag a man was seen leaving in an open doorway as police approached him at 1:48 p.m. at 3204 N. Cicero Ave. Police also recovered the two 30-round capacity magazines and 21 live rounds, along with two "flash suppressors" (commonly known as "silencers"). Police arrested the man for unlawful use of a firearm and possession of a controlled substance after they recovered narcotics from his vehicle nearby. They also recovered a Glock .40-caliber pistol (which was not among the 19 indictment firearms), loaded with 14 live rounds. |
| 12 | 5/19/18 | 5/31/18 | See #11 above. |
| 1 | 3/8/18 | 6/2/18 | Police found the LCP Ruger .380 pistol in the lap of a man asleep at the wheel of a parked car and next to the firearm's magazine and an empty liquor bottle at 8:21 a.m. at 7199 W. Foster Ave. The man told police the gun belonged to his mother. Based on his having been convicted of an earlier felony, he was charged with unlawful use of a weapon by a felon. |
| 7 | 5/13/18 | 6/17/18 | Police heard shots fired just after midnight near 1316 N. Rockwell St. and investigated on foot, catching up with a 17-year-old boy and learning that two other officers had seen the boy throwing the recovered Taurus G2C pistol (with an empty 12-round magazine) to the ground. Police arrested him for unlawful use of a weapon and reckless discharge of a firearm. According to the police report, the boy was known to police as a street gang member. |
| 2 | 3/8/18 | 7/7/18 | Police found the LCP Ruger .380 pistol (loaded with six live rounds) and an attached laser sight from a dresser drawer of a bedroom during execution of a search warrant at 11:38 a.m. at 1323 N. Campbell Ave. They arrested the man who lived in the apartment, and who was in the bedroom at the time of the search, on two counts of unlawful use of |

4

| | | | a weapon by a felon, in that (1) police found a second handgun in another dresser drawer (a Smith & Wesson 9mm pistol loaded with 15 live rounds), and (2) the man was a convicted felon. |
|---|---|---|---|

### B. Legal Backdrop

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, a defendant may be detained in custody pending trial "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(a)(4), (e)(1). The judicial officer's conclusion that no conditions of release can reasonably assure the safety of other persons and the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). The Bail Reform Act generally expresses a "preference for release," in that Section 3142(e) requires the Court to consider the possibility of less restrictive alternatives to detention. *United States v. Fattah*, 351 F. Supp. 3d 1133, 1136-37 (N.D. Ill. 2019), citing *United States v. Infelise,* 934 F.2d 103, 105 (7th Cir. 1991). "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In determining whether there are conditions of release which will reasonably assure the safety of any other person and the community, we are to take into consideration the factors set forth in § 3142(g):

> (g) **Factors to be considered.**—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, *or involves a* minor victim or a controlled substance, *firearm,* explosive, or destructive device;
> (2) the weight of the evidence against the person;

5

(3) the history and characteristics of the person, including—
A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g) (emphasis added).

As to dangerousness, a court's finding that detention is warranted need not rest on evidence of some violent act not charged in the indictment. *United States v. Arvanitis*, 667 F. Supp. 593, 598-99 (N.D. Ill. 1987). Rather, the Court may look to the nature of the offenses charged in the indictment as part of its examination of whether the analysis of the factors set forth in Section 3142(g) yields a basis to conclude that the government has established by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any person or the community. *Id.*

## II. The Court's Analysis As To Reasonable Assurance of Safety of the Community

The Court's analysis of the Section 3142(g) factors supports its finding, by clear and convincing evidence, that no release conditions or set of conditions will reasonably assure the safety of the community in this case. The indictment alleges that Defendant conspired to supply, and did supply, a total of 19 firearms to other persons in a scheme that circumvented state, local, and federal laws regulating how persons may buy, sell, and obtain firearms. According to the indictment, Defendant used a straw purchaser to cause the weapons to be bought in Wisconsin and then passed into the hands of end users in Illinois outside the regulatory framework, posing a substantial risk that those end users would use the weapons unlawfully or criminally. In this case, the evidence proffered at hearing showed that at least seven of these 19 indictment firearms were

6

recovered in Chicago amid allegations that they indeed were used or possessed criminally. In evaluating the danger that release of Defendant might pose to the safety of the community, the Court must also consider the fact that the community in question is Chicago, where a high number of guns are recovered each year, where victims of gun-related homicides number in the hundreds each year, and where the charged offense conduct carried a more particularized risk to public safety.

### A. Unlawful Trafficking of Deadly Firearms as a Generalized Risk to the Safety of the Community

#### 1. Risk That the Trafficked Firearms Will Be Used Criminally

The offenses charged here are not violent acts themselves, and the Court is aware that they are not considered "crimes of violence" as that term is used in the Bail Reform Act. *See Radick*, 2006 WL 436116 at *3, citing *United States v. Lane*, 262 F.3d 905, 906-07 (7th Cir. 2001). But the charged offense need not be a "crime of violence" under the Act for a court to apply the Section 3142(g) factors to find that no release conditions or combination of conditions will reasonably assure the safety of any person or the community. *See, e.g., Radick*, 2006 WL 436116 at *3 (detaining defendant charged with violation of Section 922(a)(1)(A), among other offenses, on ground of dangerousness to the community, upon application of the Section 3142(g) factors). But the public safety risk from firearms dealt unlawfully in violation of Section 922(a)(1)(A) and then transported across state lines to unidentified purchasers is significant. Other courts have acknowledged this risk, and information the government proffered to the Court in this case demonstrates that concerns about this risk are rooted in fact.

Courts' recognition that the communities are put at risk by the unlawful trafficking of firearms into the hands of unknown persons outside the regulatory framework (be it federal, state, or local) of firearms ownership and possession is not new in the context of the calculus of pre-trial

7

release under Section 3142(g). *See United States v. Alfred*, No. 16-cr-245-01-WSD, 2016 WL 5389185, at *2 (N.D. Ga.. Sept. 27, 2016) (affirming magistrate judge's detention order based on danger to the community where defendant was charged with falsifying records submitted to a federally licensed firearms dealer as part of a scheme to purchase multiple firearms and transfer them to unidentified persons in a manner that made defendant "a spigot of a gun pipeline of unknown length," and noting that "[t]he distribution of weapons to unknown persons presents the clear risk that they are now available to cause harm to others"); *United States v. Focia*, No. 15 CR 17-MHT, 2015 WL 1387949, at *1 (M.D. Ala. March 25, 2015) (denying motion for release by defendant in Section 922(a)(1)(A) prosecution involving transfer of firearms to "anonymous users . . . who, for all [defendant] knew, could have used the weapons for violence" and "rais[ing] concerns that he has knowingly facilitated violence by others, in that he has secretly sought to furnish illegal weapons to those who, because the weapons are underground and illegal, are much more likely to have purchased guns for nefarious use"); *United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *2-3 (N.D. Ill. Feb. 17, 2006) (citing the number of firearms (49) involved in the charged offenses – which included Section 922(a)(1)(A) – as among the facts weighing against defendant on the issue of dangerousness); *United States v. Tyson*, No. 2008-43, 2008 WL 4415298, at *3 (D.V.I. Sept. 23, 2008) (affirming magistrate judge's detention order and finding that dangerousness to the community warranted detention of defendant who had no criminal history but who was charged with violating Section 922(a)(1)(A) by bringing at least 20 guns into the judicial district during 2008, and noting that "the unlicensed dealing in firearms facilitates criminal access to guns and can increase violent crime").

In *United States v. Vick*, No. 16-10126-ADB, 2017 WL 773860, at *1-2 (D. Mass. Feb. 28, 2017), the district court affirmed a magistrate judge's detention order based on danger to the

community where the defendant had transported seven firearms from Georgia to Massachusetts without a license, reasoning that the Section 3142(g) factors including the nature of the offense precluded the court from concluding that any set of release conditions could reasonably assure the safety of the community. In *Vick*, the police recovered two of the seven weapons: one from the scene of a shooting in Boston, and one from a "verified" gang member, with the whereabouts of the remaining five guns unknown. *Id.* at *2. *See also United States v. Christie*, No. 3:17-cr-00257 (VAB), 2018 WL 4845745, at *2-3 (D. Conn. Oct. 4, 2018) (denying defendant's motion for new detention hearing amid "credible evidence" of defendant's involvement in a conspiracy to transport firearms from North Dakota to Connecticut, where "they were being used in shootings in the Hartford area"); *United States v. Sanchez*, No. 18-cr-00560-HSG-3, 2018 WL 6460323, at *2 (N.D. Cal. Dec. 9, 2018) (revoking pretrial release order of defendant accused of attempting an unlawful sale of eight firearms to an undercover agent and stating that "[a]ll of the alleged crimes involved illegal sale or use of firearms and posed a substantial danger to the community"); *United States v. Spears*, No. 2:10-cr-55, 2010 WL 24227439, at *6 (N.D. Ind. June 4, 2010) ("providing fraudulent firearms permits to persons who are not otherwise allowed by law to possess or purchase firearms creates a clear danger to the community").

In this case, the very concerns raised by the above courts were shown to have come to fruition in this case: Seven of the 19 indictment firearms were recovered in connection with an alleged criminal act in Chicago, including one shooting. The risk that straw purchases of firearms sold in Wisconsin might result in those firearms being used or possessed unlawfully in Chicago was more than speculation. The whereabouts of the remaining 12 indictment firearms are unknown, but the information from the recovery of seven of them is, at the very least, concerning with respect to the other 12. The highlights of those recoveries were:

9

- One of the indictment firearms was recovered near the scene of (and moments after) a shooting, and with its magazine empty.

- Two of the indictment firearms were recovered from convicted felons.

- One of the indictment firearms was recovered from a 17-year-old boy.

- The two Master Piece Arms pistols, with their 30-round magazines and two "silencers" (that were not a part of the indictment), were recovered from a man caught with narcotics, along with an additional weapon.

- In two of the recoveries of the indictment firearms, the arrested persons possessed other firearms not involved in the indictment, so that in these two cases, the possessors of the indictment firearms possessed multiple firearms.

- The time between the initial purchase of the recovered indictment firearms and their recovery in connection with a criminal arrest (known among criminologists as "time to crime," as will be discussed further below) ranged from as few as 10 days (and 12 days in the case of the two 30-round capacity handguns recovered in a narcotics arrest) to one to four months.

In sum, the facts proffered in this case (accepting that at this point they are considered allegations yet relevant for the Court's consideration in its Section 3142(g) analysis) have demonstrated that judicial concerns about unlawful trafficking of firearms resulting in those firearms' illegal use by their anonymous end users are more than supposition. Those concerns are well-grounded in fact.

### 2. Nature of the Firearms

The Court's analysis of the danger to the community now turns to the nature of the firearms themselves, an issue that other courts have considered a legitimate Section 3142(g) concern. *See United States v. Lemoine,* 450 F. Supp. 2d 99, 101-02 (D. Maine 2006) (considering the type of firearms – "small, easily concealed and serious," and not suitable for hunting or target practice – as weighing in favor of detention). The following facts were part of the government's proffer:

- The 19 firearms are all light-weight handguns small enough to handle in one hand and to be easily concealed on someone's person.

- The 18 semi-automatic pistols (all of the 19 handguns except the revolver) have magazines with multiple-round capacities.

- At least two of the 18 semi-automatic pistols – the two Master Piece Arms MPA930SST 9mm pistols, which were recovered from one person as a part of the six recoveries of the seven weapons – have 30-round capacities. The greater the magazine capacity, the more shots can be fired (and rapidly, as these are semi-automatic pistols) without reloading.

- Further, available literature about the Century Arms Draco 7.62x39mm pistol (one of the 19 firearms involved in this case) indicates that it too has a 30-round magazine, but the government could not confirm this at oral argument.

- Eight of the 19 handguns were of a caliber between .380 and .40, and 10 were 9mm or 10mm pistols. (The other weapon was no slouch: a .357-caliber revolver.)

The indictment firearms were generally not the type of weapons used for hunting. While they might be marketed as effective for lawful concealed carry, lawful target shooting, lawful collection, or other lawful use, they have multiple unlawful uses.[3] These unlawful uses include shooting in residential areas like the one around Rockwell and Division Streets in Chicago; security and protection in connection with the possession and sale of unlawful narcotics; and possession of firearms by convicted felons. Unfortunately, the instances of the seven recovered indictment firearms taught us that here, the alleged uses of all seven involved uses of the criminal variety. That makes the lethality and ease of use of the indictment firearms all the more relevant to the Court's conclusion that the alleged offense conduct here, namely the trafficking of the firearms into Chicago from Wisconsin for distribution to end users who thus avoid applicable laws and regulations governing firearm purchases, makes release a danger to the community.

---

[3] The Court makes no comment on the lawful purchase, possession, and use of the firearm types in question. In the instant analysis of the Section 3142(g) factor concerning offense conduct that "involves" a firearm (or in this case multiple firearms of the nature and quality described here), the Court is concerned with the *unlawful* purchase, possession and use of such firearms.

11

### 3. Evasion of the Regulatory Framework

Against the backdrop of local, state, and federal laws and regulations governing the sale and purchase of these weapons, the charged conduct here amounts to a scheme to circumvent those laws and regulations. The result of this offense conduct is that end users of these weapons can get their hands on them more easily and without having to identify themselves or comply with federal laws against straw purchase transactions (*see* 18 U.S.C. § 922(a)(1)(A)); state laws requiring firearm owners to apply for and obtain Firearms Owner's Identification Cards in order to possess firearms lawfully (*see* 430 ILCS 65 et seq.); state laws regulating the concealed carrying of firearms and requiring a permit for persons to do so (*see* 430 ILCS 66 et seq.); and city ordinances imposing additional duties on firearm owners (*see* Chicago Municipal Code § 8-20-185). Laws such as Illinois's FOID requirement exist "to promote and protect the health, safety, and welfare of the public," and to create a "system by which law enforcement authorities will be afforded an opportunity to identify those persons who are prohibited by Section 24-3.1 of the Criminal Code of 2012 [the Illinois prohibition of unlawful possession of firearms, a statute whose federal counterpart is found in 18 U.S.C. § 922(g)] from acquiring or possessing firearms ...." 430 ILCS 65/1 (2013). Law enforcement cannot confirm that a person is eligible to be a firearm owner (i.e., that a person is not a convicted felon) if law enforcement has no idea who that person is. The overall result of this circumventing of the legal and regulatory framework of firearm purchase and ownership is a diminution in the health, safety, and welfare of the public.

### B. Heightening of Risks to Public Safety in Chicago

In this case, the community where the Court is assessing the risk and danger of Defendant's release under Section 3142(g) is Chicago. And recently, the issue of how trafficked firearms (from states other than Illinois) have affected or contributed to Chicago's ongoing violence problems has

12

received a fair amount of attention. The available data suggests very strongly that the ready availability and unlawful use handguns contributes mightily to the public safety risk in Chicago.

In 2017, the City of Chicago released its Gun Trace Report, compiling statistics concerning "crime guns" that were recovered by the Chicago Police Department from 2013 through 2016; the report defined "crime guns" as those illegally possessed, used, or suspected to have been used in furtherance of a crime. City of Chicago, Office of the Mayor, "Gun Trace Report 2017" 1 (2017) ("Gun Trace Report"). The Gun Trace Report found that 60 percent of crime guns recovered by the Chicago police came from states outside Illinois. *Id.* at 8. These states numbered nine in all, and when placed in rank order according the number of illegally used or possessed firearms recovered in Chicago during the study period and having been originally purchased in those nine other states, Wisconsin ranked third at 599 weapons, or 4% of the total recovered crime guns, behind Indiana and Mississippi. *Id.* at 8, 26. Ninety percent of Chicago's crime gun recoveries were handguns (as are each of the 19 firearms described in the indictment), and in 95 percent of cases where Chicago police were able to identify the possessor of the recovered "crime guns," that person was not the original, "lawful" purchaser of the firearm identified in the ATF record generated at the point or purchase. *Id.* at 9, 11.

Further, the Gun Trace Report documented how Chicago is essentially awash in guns, as police here seized nearly 7,000 crime guns during each of the four years studied; when adjusted for population, the 2016 crime gun recoveries in Chicago represented six times as many gun recoveries per capita as New York City, and 1.5 times as many per capita as Los Angeles. *Id.* at 3.[4] Moreover, the Gun Trace Report studied "time to crime" (the time between a gun's purchase

---

[4] The number of firearms recovered in Chicago appears to have increased since the Gun Trace Report. One report stated that "more than 9,500 illegal guns" were recovered by Chicago police in 2018. Frank Main, "Chicago's 2018 murder total falls for second straight year but still tops 530," *Chicago Sun-Times* (Dec. 30, 2018).

13

and its involvement in a crime) for crime guns and found that where persons had purchased multiple recovered crime guns over the four-year data set, "the overall number of short time to crime guns increased significantly." *Id.* at 10. In other words, where *multiple* crime guns passed through an individual's hands, these guns tended to become involved in crimes more quickly than other firearms. Finally, the Gun Trace Report concluded that "Chicago remains uniquely vulnerable to interstate firearms trafficking due to surrounding states with weak regulations over the primary and secondary gun markets, including Indiana, *Wisconsin* and Kentucky." *Id.* at 16 (emphasis added).

In the meantime, by the end of the four-year data set compiled in the Gun Trace Report, gun violence was raging at an all-time high in the City of Chicago. Murders in 2016 spiked at 764, up 58% from 485 in 2015.[5] University of Chicago Crime Lab, "Gun Violence in Chicago, 2016" 5 (Jan. 17, 2017) ("Crime Lab 2016 Report"). The Crime Lab 2016 Report searched for the reasons behind Chicago's spike in gun violence and murder in 2016 but ultimately described the cause as "an unsolved puzzle." *Id.* at 18. Nonetheless, the Crime Lab 2016 Report contained some notable observations, including:

- The report noted an association between the rise in homicides with the high percentage of the city's homicides having been committed with a firearm. *Id.* at 9. The report found that the share of Chicago's homicides committed with a gun was 90 percent, compared to lower gun homicide percentages in cities with lower homicide rates, such as New York City (58

---

[5] Reports indicate that since 2016, homicides have been trending downward in Chicago, with 664 murders in 2017 and 542 murders reported in 2018. Main, *supra*. Despite these declines, few if anyone in Chicago would say that the current homicide rate is acceptable. Chicago police have attributed the decline to several factors including attempts to invest in "data-driven policing," which includes the development of "strategic decision support centers" in which, broadly speaking, police use technology-based tools to direct resources to specific areas where data indicates violent crimes are most likely to occur. *Id.* For purposes of clarification, we note that different organizations tracking homicidal deaths in Chicago may not count all such deaths as "murders." Some of the differentiation may be explained by justifiable homicides or lawful fatal shootings by police not being classified as "murders," or by Chicago police not counting murders committed on expressways within Chicago city limits, because those expressways are considered the jurisdiction of the Illinois State Police. *Id.*

percent) and Los Angeles (72 percent). *Id.* "The reason Chicago has a high overall homicide rate is entirely due to its elevated gun homicide rate." *Id.*

- The report also documented how gun-involved violent crimes (including non-fatal shootings and robberies committed with guns) increased in Chicago in 2016 by a much greater rate than crimes did not involve guns. *Id.* at 10. "This suggests that what happened in Chicago in 2016 was less about an overall increase in the prevalence of anti-social or criminal behavior, but more about a focused increase in gun violence." *Id.*

- The report further observed that data on gun recoveries in Chicago as of January 2017 showed that an increasing share of those recoveries consisted of 9 mm and .40-caliber handguns which accommodate larger-diameter ammunition and which support higher-capacity magazines allowing a shooter to fire more rounds without having to reload. *Id.* at 12. "The combination of larger ammunition and greater magazine capacity may combine to make these weapons increasingly lethal, although there remains some uncertainty on this point." *Id.*

- The report described Chicago's proximity to other states with less restrictive gun laws as among several "candidate explanations" for the Chicago's 2016 rise in gun homicides, but the report concluded that the suddenness of the increase "cast doubt" on this explanation, in that Chicago's proximity to such states did not change abruptly at the end of 2015. *Id.* at 18, 26.

The Crime Lab has not established a definitive link between interstate firearms trafficking into Illinois and the 2016 increase in Chicago's gun-related homicides. But the Crime Lab did establish a strong association between Chicago's high number of homicides and the prevalence of handgun use in those homicides, during a time in which Chicago police regularly recovered nearly 7,000 firearms a year (with the annual number now approaching 10,000), a number significantly higher than other large U.S. cities with markedly lower homicide rates. At least the volume, and possibly also the nature and quality, of handguns found on the streets of Chicago have made Chicago a more dangerous place, at least for the segment of the city's population disproportionately represented among the victims of gun violence. *See id.* at 17. The empirical evidence at least shows that conduct of the kind alleged in the indictment heightens the risk of gun violence in a city where so many violent offenses are being committed with guns. And as other courts (such as *Focia* and *Tyson*) have observed, the underground aspect of straw-purchase

15

firearms trafficking tends to increase access to these weapons by persons likely to have an intent to use them unlawfully.

Two other data points from the City of Chicago's Gun Trace Report back this conclusion: First, an extraordinarily high number (95 percent) of crime guns linked to specific possessors did not come into those possessors' hands via an original, lawful purchase. Gun Trace Report at 9, 11. Here, we know the indictment alleges that Defendant's distribution of the 19 handguns was not to original, lawful purchasers. Second, where multiple recovered crime guns were linked to a single person over the four-year data set, the guns' "time to crime" was significantly shorter. *Id.* at 10. Here, Defendant is said to have orchestrated at least 19 separate illegal firearms transactions, one of them involving seven firearms purchased at one time from a gun show in Union Grove, Wisconsin. Of the six recoveries of the seven indictment firearms, two involved persons who possessed multiple firearms, and one was recovered near the scene of a shooting. And the "time to crime" in each of the six recoveries of indictment firearms was remarkably short, in some cases only 10 or 12 days. Just 12 days after the straw purchase scheme caused two 9mm pistols with 30-round magazines to be bought in Wisconsin, Chicago police recovered those two weapons during a narcotics arrest.

### C.     Other Section 3142(g) Factors

Courts have considered the "weight of the evidence" under Section 3142(g) to be the least important among the factors at the indictment stage, *Radick*, 2006 WL 436116 at *2, and this Court agrees, although the Court is able to determine from the government's proffer at hearing that the weight of the evidence is strong. The charges here are supported by a grand jury indictment finding probable cause, and the government proffered that the evidence included videotape of the defendant in one of the Wisconsin purchase locations; moreover, the matching of the serial

numbers of seven recovered firearms with seven of the firearms Defendant allegedly trafficked into Illinois is strong evidence as well.

The history and characteristics of Defendant warrant some additional discussion within the framework of the risk to public safety posed by his release. Information provided to the Court about Defendant's background makes clear that he has no regular means of gainful employment and thus no legitimate sources of income other than a modest monthly disability payment on which his girlfriend has stated she partially relies. A reasonable inference from the indictment is that the allegations at least suggest that the lure of additional income from firearms trafficking was too great for Defendant to resist as recently as the spring of 2018, and the Court is concerned that without steady employment or a more substantial source of income, the risk of him resorting to more interstate firearms trafficking – an offense that can be committed without leaving this judicial district, or even leaving home or the range of an electronic monitor – is too great, with the resulting unacceptable risk to the safety of a community already awash in crime guns. Nor can standard release conditions, such as promises to break no laws or engage in no new criminal conduct, be sufficient to alleviate the risk to the community's safety in this case from this Defendant, who has repeatedly shown an inability or an unwillingness to keep those kinds of promises when he was under court supervision and probation for earlier offenses. In addition, although he is not charged with violating Section 922(g)'s prohibition on possession of a firearm by convicted felons, the Court notes that the information supplied to it during the detention hearing process includes the fact that Defendant is a twice-convicted felon, having been convicted previously of state charges, in separate cases, of felony fleeing and felony driving on a revoked license while under the influence. The facts proffered in connection with the fleeing offense are troubling, in that they involve Defendant allegedly driving away and trying to elude law enforcement after officers saw

17

an armed person enter the car he was driving. The proffered facts (concerning an offense to which Defendant pleaded guilty) included his running a red light and multiple stop signs before driving the wrong way down a one-way street; this kind of conduct endangered the community and law enforcement. The Court simply does not believe that release of Defendant, under all these circumstances and given the charged offense conduct, can be done in a manner that will reasonably assure the safety of the community.

### III. Conclusion

There is a more-than-adequate basis for the Court to find by clear and convincing evidence that amid the increased risk to Chicago's public safety posed by the nature and circumstances of the charged offenses and by Defendant's release, no release condition or set of conditions will reasonably assure the safety of the community. Through the secretive scheme alleged in the indictment, Defendant is accused of transferring the 19 indictment firearms into a community where 90 percent of the homicides are committed with handguns, where the number of murdered runs into the hundreds every year, and where, despite the maxim that "guns don't kill people, people kill people," the Office of the Mayor of the City of Chicago has concluded that "[p]eople do kill people, and disproportionately use firearms to do so." Gun Trace Report at 15-16. Offenses such as those charged here ease the access to guns by persons who do not want handguns traced to them. Indeed, if the indictment is credited, putting these 19 illegally purchased firearms in the hands of persons who did not want the guns to be readily traceable to them was practically as easy as going to Wisconsin.

As one Chicago newspaper columnist put it:

With no gun stores in Chicago and no background check loopholes for private sales, one thing is clear. The guns being used to kill people on Chicago's streets aren't originating in Chicago. They're coming from someplace else .... Those with felony convictions commonly use straw purchases, in which they enlist someone with a

clean record to purchase multiple guns and bring them into the city. Law enforcement officials say 60 percent of the guns confiscated on the streets of Chicago come from Indiana, Wisconsin, and Mississippi. The other 40 percent come from suburban Cook County and nearby suburbs. It's tough, but we can try to sort out the bad apples in our own state and shut them down. But we're helpless when it comes to regulating Indiana, Wisconsin, and Mississippi.

Dahleen Glanton, "The truth – and lies – about Chicago's gun laws," *Chicago Tribune* (Oct. 3, 2017).

This added risk that release of Defendant would pose to Chicago is too great for that community to bear. The Court therefore finds by clear and convincing evidence, per an analysis of the factors in Section 3142(g), that no release condition or set of conditions in this case will reasonably assure the safety of the community.

**SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: September 11, 2019**